IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| **FREESCALE SEMICONDUCTOR, INC.,** § | | |
| Plaintiff, § | | |
| § | | |
| V. § | A-13-CV-075-LY | |
| § | | |
| **MAXIM INTEGRATED PRODUCTS, INC.** § | | |
| **and TANJU YURTSEVER,** § | | |
| Defendants. § | | |

## ORDER

Before the Court is Plaintiff Freescale Semiconductor, Inc.'s Motion to Compel Discovery Regarding the Intentional Destruction of Evidence (Dkt. No. 21); Defendant Maxim Integrated Products, Inc.'s Response (Dkt. No. 26); and Plaintiff Freescale Semiconductor, Inc.'s Reply (Dkt. No. 31). The District Court referred the above motion to the undersigned Magistrate Judge for disposition pursuant to 28 U.S.C. § 636(b)(1)(A), FED. R. CIV. P. 72, and Rule 1(c) of Appendix C of the Local Rules of the United States District Court for the Western District of Texas, Local Rules for the Assignment of Duties to United States Magistrate Judges.

### I.  GENERAL BACKGROUND

This case arises out of a copyright infringement dispute involving the alleged improper use of copyrighted software by Defendants Maxim Integrated Products, Inc. ("Maxim"), and Tanju Yurtsever ("Yurtsever"). Plaintiff Freescale Semiconductor, Inc. ("Freescale"), alleges that Maxim and Yurtsever "misappropriated Freescale's proprietary and confidential [s]oftware and begain illegally copying and/or creating derivative works of it to support Maxim's operations . . . ." Dkt. No. 33, ¶ 23. Freescale further charges Maxim and Yurtsever with "stealing Freescale's trade secrets, reproducing system concepts, processes, strategies, architecture and designs." *Id.*

Prior to his employment at Maxim, Yurtsever had spent eighteen years with Freescale, where he worked on enhancing and developing software for Freescale's manufacturing processes, including custom dispatching software. *Id.* ¶¶ 14, 16. In 2010, several Freescale employees, including Yurtsever, terminated their employment with Freescale to work at Maxim. *Id.* ¶ 18. Upon ending his employment at Freescale, Yurtsever was reminded that he had been given access to Freescale's proprietary and confidential information and that the work he would be doing at Maxim could very well result in the disclosure of Freescale's information. *Id.* ¶ 19. Yurtsever was also directed to collect and return all Freescale property, including all Freescale's proprietary and confidential information that Yurtsever possessed, regardless of whether the information was stored at Freescale or otherwise. *Id.* ¶ 20. Despite these warnings, Freescale alleges that Yurtsever failed to return all of Freescale's proprietary and confidential information; instead, Freescale asserts that Yurtsever knowingly took all of the Freescale source code on which he had worked. *Id.* This allegation stems from an anonymous tip Freescale received in 2012, which disclosed to Freescale that its proprietary and confidential software were being used at Maxim and displayed in presentations shown at Maxim. *Id.* ¶ 22. Freescale filed the instant suit on January 28, 2013.

After this case was filed, Freescale learned that Maxim had received an anonymous whistleblower submission in late 2011, informing Maxim that Freescale's proprietary and confidential software was being improperly used at Maxim by its employees, including Yurtsever. Dkt. No. 21 at 1. According to Freescale, in or around April 2012, Yurtsever met with Maxim's Legal Department regarding the allegations that he was using Freescale's confidential software information. *Id.* Yurtsever then proceeded to delete information on several external hard drives and flash drives containing Freescale software code and Freescale documents. *Id.* Shortly thereafter,

Yurtsever physically destroyed the external hard drives using a screwdriver and also broke the flash drives in half, disposing of the remnants in the trash. *Id.* Yurtsever claims that he misunderstood the instructions provided to him by Maxim regarding the preservation of evidence, believing that he was only required to preserve evidence on "Maxim property." *Id.* at 2. Based on these findings, Freescale filed the instant motion on September 11, 2013, seeking discovery relating to "(a) the anonymous whistleblower submission; and (b) the communications between Yurtsever and Maxim, which led to the intentional destruction of key evidence in this case." *Id.* In particular, Freescale requests the Court to compel discovery on the following topics: (1) Maxim's correspondence with the anonymous whistleblower via EthicsPoint; (2) Maxim's correspondence with Yurtsever in April 2012 regarding evidence preservation, collection, or production; and (3) depositions of any Maxim employee who, in April 2012, discussed evidence preservation, collection, or production with Yurtsever. *Id.* The Court conducted a hearing on October 15, 2013.

## II. ANALYSIS[1]

In its Motion to Compel Discovery, Freescale argues that it is entitled to discovery involving Maxim's communications with the anonymous whistleblower, including the initial submission as well as the follow-up messages, because such communications are not protected by the attorney-client privilege. Dkt. No. 21 at 9. Freescale submits that the anonymous whistleblower submission

---

[1] Prior to the hearing on October 15, 2013, the parties represented to the Court that they had reached an agreement concerning the issue of whether Freescale is entitled to discover communications between Maxim and Yurtsever relating to the preservation of evidence. Dkt. No. 35. Pursuant to the parties' resolution on that issue, Freescale agreed to withdraw that part of its Motion to Compel Discovery without prejudice. *Id.* As such, the Court will **DISMISS WITHOUT PREJUDICE** the portion of Freescale's Motion to Compel Discovery concerning whether it is entitled to discover communications between Maxim and Yurtsever relating to the preservation of evidence.

and subsequent communications were not made by a client or for the purpose of seeking legal advice. *Id.* at 10. Freescale also contends that whether the information submitted by the anonymous whistleblower was reviewed by an attorney is irrelevant to the question of whether the information is protected by the attorney-client privilege because the EthicsPoint website does not inform the potential whistleblower that an attorney will review the submission and, in any event, Maxim's attorneys represent the interests of Maxim, not its employees individually. *Id.* at 11. Alternatively, Freescale argues that communications between the anonymous whistleblower and Maxim are not protected by the work product privilege. *Id.* at 12. Maxim responds that there is overwhelming evidence that the whistleblower was a Maxim employee. Dkt. No. 26 at 12–14. Given the evidence that the whistleblower was a Maxim employee, and that any anonymous report would go to the Maxim Chief Compliance Officer, who the Maxim website identifies as the company's general counsel, and relying on the Supreme Court's decision in *Upjohn Co., et al. v. United States, et al.*, 449 U.S. 383 (1981), Maxim argues that any communication between a Maxim employee and the company conducted through the EthicsPoint website is protected by the attorney-client privilege. Dkt. No. 26 at 10–15.

The parties' main disagreement involves the scope of the attorney-client privilege and the extent to which the Supreme Court's decision in *Upjohn* applies to the circumstances of this case. At the hearing, Freescale put forth two primary arguments supporting its contention that Maxim's communications with the anonymous whistleblower are not protected by the attorney-client privilege, namely that (1) there is no evidence in the record suggesting that a person making a submission through Maxim's EthicsPoint portal would expect to receive legal advice or that the submission would be reviewed by an attorney and (2) there is insufficient evidence to demonstrate

that the anonymous whistleblower was a Maxim employee. Concerning the application of *Upjohn*, Freescale contends that (1) the circumstances in this case do not arise in the same factual or procedural context as *Upjohn* and (2) the anonymous whistleblower has not been conclusively shown to be a Maxim employee. On the other hand, Maxim submits that *Upjohn* does not stand for the proposition that an employee who reports potential issues to a company needs to be seeking legal advice in order for the attorney-client privilege to attach. Rather, the communication need only be with an individual who has the ability to seek legal advice on behalf of the company. Additionally, Maxim points this Court to the company's Code of Conduct, arguing that the policy clarifies that any reports of potential issues would be reviewed by Maxim's Chief Compliance Officer, who is also Maxim's General Counsel.

At the hearing, at the Court's request, Maxim submitted a copy of the disputed document as well as its First Supplemental Privilege Log for the Court to review *in camera* After considering the parties' arguments as well as the document at issue, the Court will **GRANT IN PART** and **DENY IN PART** Freescale's Motion to Compel Discovery as it pertains to Maxim's communications with the anonymous whistleblower.

"The attorney-client privilege is the oldest of the privileges for confidential communications known to the common law." *Upjohn*, 449 U.S. at 389. The purpose of the attorney-client privilege is "to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." *Id.* "A corporate client has a privilege to refuse to disclose, and prevent its attorneys from disclosing, confidential communications between its representatives and its attorneys when the communications were made to obtain legal services." *Nguyen v. Excel Corp.*, 197 F.3d 200, 206 (5th Cir. 1999). The

privilege applies not only to communications with outside counsel, but also to communications between a client corporation and its inside counsel. *See AHF Community Development, LLC v. City of Dallas*, 258 F. R. D. 143, 146 (N.D. Tex. 2009).

In *Upjohn*, the Supreme Court considered, in part, a dispute over whether written questionnaires completed by Upjohn's foreign affiliate managers were protected by the attorney-client privilege. 449 U.S. at 387–88. In that case, independent accountants had notified Upjohn's general counsel that at least one of its foreign subsidiaries had made improper payments to a foreign government in order to obtain government business. *Id.* at 387. After consulting with outside counsel, Upjohn's general counsel decided to initiate an internal investigation into these alleged payments. *Id.* A questionnaire was then sent to all of Upjohn's foreign managers, informing them that "the company's General Counsel" had been tasked with conducting an investigation into the alleged payments to foreign governments and seeking detailed information about these payments. *Id.* The managers were instructed that the investigation was "highly confidential" and to only speak with employees who might be able to assist in the investigation. *Id.* In deciding how broadly the attorney-client privilege applied in this context, the Supreme Court ultimately rejected the "control group test" applied by the Sixth Circuit Court of Appeals, finding the test to be too restrictive to achieve the purposes of the privilege and too difficult to apply in practice. *Id.* at 390–93. In reaching its conclusion, the Supreme Court explicitly recognized that the attorney-client privilege does not only extend to senior management officers, but also middle- and lower-level employees who have information that could be used by the corporation's lawyers to provide legal counsel to the corporation. *Id.* at 391 ("Middle-level- and indeed lower-level-employees can, by actions within the scope of their employment, embroil the corporation in serious legal difficulties, and it is only natural

that these employees would have the relevant information needed by corporate counsel if he is adequately to advise the client with respect to such actual or potential difficulties."). Because the communications in the questionnaires "concerned matters within the scope of the employees' corporate duties, and the employees themselves were sufficiently aware that they were being questioned *in order that the corporation could obtain legal advice*," the Supreme Court determined that the completed questionnaires were protected by attorney-client privilege and not subject to discovery. *Id.* at 394–95 (emphasis added).

Here, the anonymous whistleblower made three submissions via the EthicsPoint portal used by Maxim. An initial submission was made on December 14, 2011, and two follow-up communications were submitted on December 20, 2011, and February 24, 2012. Maxim's Chief Compliance Officer and General Counsel, Ed Medlin, communicated with the anonymous whistleblower twice via EthicsPoint—once on December 14, 2011, in response to the initial submission and again on February 27, 2012, in response to the whistleblower's submission on February 24, 2012. Upon review of the documents containing these discussions, the Court determines that the initial submission made by the anonymous whistleblower on December 14, 2011, is not protected by the attorney-client privilege and should be produced. The initial submission is distinguishable from the questionnaires at issue in *Upjohn* because it was made prior to the start of any investigation by Maxim into the specific allegations that Freescale's software was being improperly used at Maxim. There is also insufficient evidence to demonstrate that the anonymous whistleblower was seeking legal advice or that this information was somehow solicited by Maxim in order for Maxim's legal counsel to render legal advice to the company. Consequently, the Court

concludes that the initial submission by the anonymous whistleblower is not protected by the attorney-client privilege and must be produced.

However, the subsequent communications between Ed Medlin and the anonymous whistleblower via EthicsPoint are protected by the attorney-client privilege. This includes communications made via EthicsPoint by the anonymous whistleblower to Ed Medlin on December 20, 2011, and February 24, 2012, as well as the communications made by Ed Medlin to the anonymous whistleblower on December 14, 2011, and February 27, 2012. In the initial communication the whistleblower identifies him or herself as a Maxim employee.[2] The content of the subsequent communications show that more specific information was being solicited from the anonymous whistleblower—a Maxim employee—in order for Maxim's General Counsel, Ed Medlin, to investigate the allegations and render legal advice to Maxim. Additionally, the content of the follow-up communications also clarifies that the messages were exchanged after Maxim had started its investigation into the anonymous whistleblower's claims. These facts align the circumstances of the subsequent communications with the situation in *Upjohn*, where the Supreme Court determined that information given by Upjohn employees in response to questionnaires that were meant to assist an internal investigation was protected by the attorney-client privilege. As such, the Court will **DENY** Freescale's Motion to Compel with respect to the subsequent communications via EthicsPoint between the anonymous whistleblower and Ed Medlin.

---

[2]At the hearing and in the briefing, a significant point of contention was whether the anonymous whistleblower was actually a Maxim employee. In the initial submission, the anonymous whistleblower indicates that he/she is a Maxim employee and that the allegations contained therein were based on personal observations. Based on the information provided, the Court concludes that Maxim has sufficiently demonstrated that the anonymous whistleblower was a Maxim employee at the time the submission was made.

Freescale points this Court to a recent decision from the Eastern District of Tennessee, *Leazure v. Apria Healthcare Inc.*, No. 1:09–224, 2010 WL 3397685 (E.D. Tenn. Aug. 26, 2010), as support for its contention that the communications between the anonymous whistleblower and Maxim are not privileged and should be produced. *See, e.g.*, Dkt. No. 31 at 6. However, Freescale's reliance upon *Leazure* is unconvincing for two reasons. First, as Freescale acknowledged at the hearing, the court in *Leazure* primarily considered whether the documents in dispute were protected by Tennessee's attorney-client privilege rather than federal law concerning the privilege. *See, e.g.*, *Leazure*, 2010 WL 3397685 at *1. Secondly, given that Maxim has submitted the disputed document for the Court's *in camera* review, the Court has been able to carefully evaluate the subsequent communications based on the specific content and information contained therein. As such, the Court declines to adopt Freescale's reliance upon *Leazure*.

Finally, because the Court finds the subsequent communications between the anonymous whistleblower and Ed Medlin to be protected by the attorney-client privilege, the Court need not reach the question of whether the communications from Ed Medlin to the anonymous whistleblower on December 14, 2011, and February 27, 2012, are further protected by the work product privilege.

### III.  CONCLUSION

In accordance with the foregoing discussion, the Court hereby **GRANTS IN PART** and **DENIES IN PART** Freescale's Motion to Compel Discovery Regarding the Intentional Destruction of Evidence (Dkt. No. 21). Freescale's Motion is **GRANTED** to the extent it seeks production of the initial submission by the anonymous whistleblower. Freescale's Motion is **DENIED** to the extent it seeks production of the subsequent communications between the anonymous whistleblower

and Maxim's Chief Compliance Officer and General Counsel. Maxim shall produce the responsive document no later than November 6, 2013.

Furthermore, the Court hereby **DISMISSES WITHOUT PREJUDICE** the portion of Freescale's Motion to Compel Discovery concerning whether it is entitled to discover communications between Maxim and Yurtsever relating to the preservation of evidence.

SIGNED this 30th day of October, 2013.

_____
ANDREW W. AUSTIN
UNITED STATES MAGISTRATE JUDGE